## COMMONWEALTH *vs.* MICHAEL PERRYMAN.

No. 00-P-1164.

Suffolk. December 6, 2001. - June 13, 2002.

Present: LAURENCE, GILLERMAN, & GRASSO, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Instructions to jury, Objections to jury instructions. *Evidence,* Demonstration, Unavailable witness, Failure to produce witness.

At a criminal trial, the judge did not abuse her discretion in allowing the jury to look through the telescope used by the police officer whose surveillance led to the defendant's arrest where, on the record presented, the defendant failed to preserve his objection to the telescope demonstration, and where, even if the judge erred in allowing the demonstration, the defendant failed to establish that such error was prejudicial. [189-197]

At a criminal trial, the judge did not err in giving, sua sponte, a "missing witness" instruction because of the defendant's failure to call as a witness his girlfriend with whom, he had testified, he had spent virtually the entire evening in question, where the "missing" testimony would have been central to the defense as the principal corroborative evidence for the defendant's alibi. [197-200]

COMPLAINT received and sworn to in the Boston Municipal Court Department on August 2, 1999.

The case was tried before *Annette Forde,* J.

*Alex Philipson,* Assistant District Attorney, for the Commonwealth.

*Edward W. Wayland* for the defendant.

LAURENCE, J. Convicted, after a jury trial, of distribution of crack cocaine, a Class B drug (G. L. c. 94C, § 32A) within 1,000 feet of a school zone (G. L. c. 94C, § 32J), the defendant asserts that several errors tainted his trial. Only two of his claims warrant extended discussion: (1) the trial judge abused her discretion in allowing the jury to look through the telescope used by the police officer whose surveillance led to the defendant's arrest, under what the defendant characterizes as

"misleadingly favorable conditions"; and (2) the trial judge erred in giving, sua sponte, a "missing witness" instruction because of the defendant's failure to call as a witness his former girlfriend with whom, he had testified, he had been virtually the entire evening in question. Discerning no merit in his contentions, we affirm the judgments.

The facts established by the evidence reveal the following. Around midnight on August 1, 1999, Detective Sergeant James Fong, a twenty-five year veteran of the Boston police department who had received special drug enforcement training and had made over 1,500 crack cocaine arrests, stood on the fifth floor of the Radisson Hotel parking garage. From that location, Fong was conducting surveillance of the theater district in downtown Boston, using a telescope (described as a "Swift Model 841 Telemaster") as well as his unaided eyesight while scanning for "drug activity" in an area where he had been involved in "well over a thousand" arrests for sales of crack cocaine. According to Fong, there were many open businesses and signs providing multiple sources of artificial lighting that illuminated the area he surveilled, which he described as "very well lit."

While using his telescope, Fong observed an individual (later identified as James Berger) approach another individual riding an orange mountain bike (later identified as codefendant Jerry Carrasquillo) on Stuart Street. Berger handed Carrasquillo what Fong recognized as United States currency. He saw Carrasquillo turn and point to an African-American male (later identified as the defendant) sitting on a fence about thirty feet from where Carrasquillo stood (and about three hundred feet from Fong's lookout). Fong then observed Berger walk up to the defendant. Following a brief conversation, the defendant spat an object into his right hand and put it in Berger's right hand. Berger inspected the object and began walking away. Based on his training and experience, Fong concluded that he had just witnessed "actions consistent with . . . drug activity." Throughout the incident Fong's "view [was] unobstructed . . . a straight line view."

Fong immediately radioed his observations to fellow officers waiting on the ground in the vicinity. Two of them proceeded to

stop Berger as he walked toward the Radisson Hotel, only moments after the transaction Fong had detected. They recovered a small plastic bag containing what proved to be crack cocaine in Berger's right hand and arrested him. Another officer, upon receiving Fong's description of the defendant (as a black man wearing a blue and white horizontally-striped shirt and blue jeans), saw him moments later entering a "7-Eleven" convenience store on Stuart Street, followed him into the store and arrested him. Upon being searched, the defendant was found to have $190 in cash and a cellular phone. During booking, he gave the police a false name ("Dion Ball"). (Carrasquillo was not arrested until almost two hours later, working the same area on his bike, with $312 in cash on his person.) Fong measured the distance from the point of the Berger-defendant transaction to a nearby public school as 760 feet.

The defense case consisted of Berger testifying that someone other than the defendant had given him the crack cocaine and the defendant testifying that he had not been involved in any drug sales on August 1 and had never before seen Berger or Carrasquillo. The defendant claimed that he had been with his former girlfriend, Tasha Johnson, at a nightclub in the theater district from 9:00 P.M. until midnight that evening. Upon leaving the club, they had smoked cigarettes together, after which he had sent her home in a taxi and had then gone into the 7-Eleven to purchase more cigarettes. He explained the large amount of cash found on him as being "child support" money he had earned at a former job which he had brought for Tasha, who was the mother of his two year old child, but which he had forgotten to give her. When arrested, he called Tasha, who came to the police station and unsuccessfully tried to bail him out. Asked by the prosecutor about Tasha's absence from the trial, the defendant responded that, though he knew where she was currently living ("in a shelter . . . [with] three kids"), "she's going through some problems right now." He admitted he had given a false name to the police when booked but said he did so because he "was scared."

*The telescope demonstration.* The defendant argues that it was reversible error for the judge to permit the jurors to look through Detective Fong's telescope during trial. That demonstra-

tion occurred pursuant to the Commonwealth's request, made just prior to the commencement of trial, that Fong (the prosecutor's first witness) be allowed to set up his telescope for juror viewing following his testimony. Defense counsel objected on the ground that the lighting conditions during the daytime at the courthouse were not the same as those on the evening of the transaction. The judge overruled the objection but assured defense counsel she would instruct the jurors regarding the lighting differences. After a luncheon recess, as Fong set up his telescope prior to opening statements, defense counsel again raised an objection to a demonstration, without stating any reason therefor. The judge noted that the defense objection "has been put on the record."

At the end of Fong's direct testimony, he was asked about his use of the telescope. He testified that it could magnify objects between fifteen and sixty times. On the evening of August 1, he had set it to magnify approximately twenty-five times, while he was (he estimated) about three hundred feet from the transaction. He acknowledged that the demonstration would involve viewing a sign outside the courthouse, at that same magnification, which was at most about two hundred feet away; but he explained that there was "no real amount" of difference between the "very well lit" conditions on August 1 and those in the courtroom. A third defense objection to any telescope demonstration followed, without specificity, which the judge again "noted," implicitly overruling it. The judge then instructed the jury as follows:

> "Ladies and gentlemen, we are going to have a demonstration of the scope for you. Please keep in mind that when you look through the scope, we will not be able to duplicate the conditions that were in place on the night in question. First of all, this is the daytime, we're inside a building, so it will be different, but this is just to give you an idea of what it looks like, and *this is not so that you can make a determination of exactly the way anything would look. It is simply a demonstration* to aid and assist you in determining how the officer who observed — made the observations looked through the scope and what you believe he would have been able to see. You will make

[unintelligible] determination yourself with respect to the evidence in this case. *This is simply a demonstration. It is not proof of anything.*" (Emphases added).

After this instruction, counsel for the codefendant stated that he would join in the defendant's objection to the demonstration. Neither he nor defendant's counsel, however, referenced any particular or further ground therefor. The jurors were then led by the court officer one by one to look through the telescope (as did counsel for codefendant Carrasquillo), without comment by judge, counsel, or witness.

Following the jurors' viewing of the telescope, they were released for the day (it was apparently mid to late afternoon), with the usual warnings. At that point, the defendant's counsel stated an objection to "the admission of any type of demonstration . . . regarding the scope," to "any . . . admissible evidence regarding the scope," and to the scope being "admitted in evidence as an exhibit, to go back into the Jury Room." The judge reassured her that the telescope would not be admitted in evidence as an exhibit or allowed to be taken into the jury room. Counsel then proceeded to list "a number of reasons why the scope was not going to be the same today as it was that night." She cited, in addition to the differences in lighting conditions, the shorter distance involved in the demonstration while the telescope remained at the same magnification as used on August 1 (although no evidence or even a description of what, if any, difference the variable of the shorter distance would make was proffered, except for counsel's speculation that it "might" produce "a great discrepancy in what the jury will view") and differences in jurors' vision that could affect their ability to perceive. Counsel concluded by urging that the jury "should be given a very strong instruction as to whether or not that should be given any more weight or credibility than any other part of the officer's testimony."

The judge said that she "agree[d] with [counsel's] recommended instructions" but added:

"[L]et's just . . . note at this point that the demonstration has already been done . . . there's not much that could be done to undo the fact that they've already seen what they saw through the scope . . . your more detailed

argument comes a little bit too late . . . [though] that does not mean that I would change my ruling, even based on your point of argument."

Defense counsel did not respond to the judge's admonition.

In her final instructions, the judge reminded the jury, with respect to the "demonstration of the scope allegedly used by" Detective Fong, that they "should keep in mind . . . the differences between the actual events and the demonstration" (including lighting conditions, distances, and differences in people's vision) and "not allow this demonstration to substitute for your duty to evaluate all of the evidence introduced at trial. You should determine [whether] that testimony concerning the alleged transaction . . . is credible or is not credible . . . [T]he scope simply provides a powerful means to view objects [but t]his should not impair your credibility determination. Keep in mind . . . it simply was a demonstration for you." No objection was lodged against this charge, which was immediately followed by a reiterated instruction that the Commonwealth had the burden of convincing the jury beyond a reasonable doubt that it had correctly identified the defendant as the perpetrator of the crime charged.

On this record, the defendant failed to preserve his objection to the telescope demonstration. Moreover, he has also failed to establish that, even were we to hold that the judge erred in allowing the demonstration, any prejudicial error (much less any risk of a miscarriage of justice) was occasioned.

It is black letter law that objections to evidence, or to any challenged order or ruling of the trial judge, are not preserved for appeal unless made in a precise and timely fashion, as soon as the claimed error is apparent, so as "to afford the trial judge an opportunity to act promptly to remove from the jury's consideration evidence [or whatever else is claimed to have been improperly presented] . . . which has no place in the trial." *Abraham* v. *Woburn*, 383 Mass. 724, 726-727 n.1 (1981). See *Commonwealth* v. *Gallison*, 383 Mass. 659, 669 (1981) ("It is a fundamental principle of appellate review that a prompt objection at trial is a prerequisite to the presentation of an issue for appellate review"); *Commonwealth* v. *Comtois*, 399 Mass.

668, 674 (1987) (same); Mass.R.Crim.P. 22, 378 Mass. 892-893 (1979) (objector invited to "state the precise legal grounds of his objection"); Reporters' Notes to Mass.R.Crim.P. 22, Mass. Ann. Laws, Rules of Criminal Procedure at 272-273 (West 1995). Cf. *Commonwealth* v. *Silvia*, 343 Mass. 130, 136 (1961) (objection to an item of real evidence must be made before the item is admitted in evidence); Proposed Mass.R.Evid. 103(a)(1) (objection should "stat[e] the specific ground of objection").

Here the only "precise" or "specific" ground presented to the judge in a timely manner as objection to the demonstration of the telescope was the difference in lighting conditions. On appeal, the defendant does not focus on that particular objection but rather asserts reversible error occurred by virtue of the allowance of any demonstration at all, because "[t]he trial court knew it could not reproduce Sgt. Fong's experience of using it when he allegedly saw [the defendant] sell cocaine." He thus challenges the demonstration per se because "ideal conditions" did not prevail and "[n]othing about the view matched the conditions or obstacles Sgt. Fong faced on August 1." The defendant's attempt to mount a holistic appellate attack on the demonstration fails.

First, he "cannot try a case on one theory and then, having lost on that theory, argue before an appellate court about alleged issues which might have been, but were not, raised at the trial." *Commonwealth* v. *Olson*, 24 Mass. App. Ct. 539, 544 (1987). Second, the defendant offers no relevant authority supporting the identity of conditions he posits as a prerequisite for a demonstration, nor does our law demand such identity. A courtroom "experiment, demonstration, or reenactment"[1] may be permitted by the trial judge so long as it "sufficiently

---

[1] The defendant relies exclusively on authorities involving views of criminal scenes (none of which, however, supports his contentions), rather than cases involving demonstrations. We note that the law regarding the allowance of views — it is within the trial judge's "considerable discretion" whenever she determines that it would be of assistance to the jury's better understanding of testimony that has been or may be presented, see *Commonwealth* v. *Cataldo*, 423 Mass. 318, 327 n.8 (1996), and it is not an abuse of that discretion to permit a view even though the conditions at or appearance of the scene have changed or are not identical to those obtaining at the time of the criminal incident, see *Commonwealth* v. *Welansky*, 316 Mass. 383, 401-402 (1944);

resembles the actual event so as to be fair and informative." *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 173 (1983). "Whether the conditions were sufficiently similar to make the observation [offered by the demonstration] *of any value in aiding the jury* to pass upon the issue submitted to them [is] primarily for the trial judge to determine as matter of discretion. [The judge's] decision in this respect will not be interfered with unless plainly wrong." *Commonwealth* v. *Chipman*, 418 Mass. 262, 270-271 (1994) (cited and quoted authorities omitted, emphasis added).

The defendant fails to establish any abuse of discretion or plain error on the part of the judge in rejecting the sole articulated objection to the telescope demonstration, the difference in lighting conditions. In light of Detective Fong's uncontradicted testimony that the scene he viewed on August 1 was "very well lit," with "no real" difference in the amount of light available then as compared with that in the courtroom,[2] that the

---

*Commonwealth* v. *Clark*, 432 Mass. 1, 17 (2000); *Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 708-709 (1974) — is not essentially different from that applicable to demonstrations. Indeed, the demonstration of an object relevant to the particular case, as occurred here, falls literally within the statutory authorization for the allowance of views, G. L. c. 234, § 35 ("The court may . . . allow the jury . . . to view the premises or place in question or any property, matter or thing relative to the case"). Additionally, the allowance of the instant demonstration — as to which the judge expressly ruled and instructed that the telescope and the jurors' experience of looking through it were not evidence or part of the record — was substantially indistinguishable from the well-established use of "chalks," in the judge's discretion, to illustrate testimony and assist the jury in weighing evidence they hear, so long as there are sufficient similarities between the "chalk" and the circumstances of the matter sought to be proved. See *Aselbekian* v. *Massachusetts Turnpike Authy.*, 341 Mass. 398, 402 (1960); *Commonwealth* v. *Shea*, 38 Mass. App. Ct. 7, 11-12 (1995).

[2]The only authority cited by the defendant that relates to lighting conditions, *Commonwealth* v. *Rodriguez*, 378 Mass. 296 (1979), does not assist him. There, the court upheld the trial judge's denial of the defendant's motion for a jury view of the rape scene as not constituting an abuse of discretion, because the judge "might well have thought that a view would be of no aid to the jury, or that potential differences in lighting conditions would render a view misleading." *Id.* at 307. Beyond that statement, no details concerning the motion or the comparative lighting conditions were mentioned by the court in *Rodriguez*, so that any conclusions regarding the nature of the judge's discretionary exercise there would be speculative and inapplicable here, where the established circumstances support the judge's allowance of the view. To

telescope was set to the same magnification and that both views were clear and unobstructed, the judge's denial of that limited objection was well within her broad discretion. It implicitly rested on a finding of sufficient similarity in conditions to make the jury's observations offered by the nonevidentiary demonstration of some value in evaluating Fong's testimony.[3]

The judge's rejection of the defendant's belated, amplified critique of the just-completed telescope demonstration was also a proper exercise of her discretion. The defendant's failure to call the judge's attention to the additionally asserted problems at the time they could be addressed and corrected, so as to avoid even the possibility of necessitating a new trial, violated the fundamental rules of trial practice. See *Commonwealth* v. *Keevan*, 400 Mass. 557, 563-564 (1987). Those added criticisms were particularly untimely, in that they unrealistically

---

the extent lighting conditions at the rape scene in *Rodriguez* can be gleaned from the body of the opinion, it appears that the scene was in a dimly lit residential area illuminated only by two street lamps approximately one-half block apart and by reflected light from nearby homes. See *id.* at 300. Another case cited by the defendant, *Commonwealth* v. *Jewett*, 17 Mass. App. Ct. 354 (1984), adds nothing, merely quoting the same language from *Rodriguez* mentioned above. It, too, involved a rape scene in a dimly lit area, a wooded slope behind the victim's home, with some light coming from outdoor lights of other buildings near the base of the slope. See 17 Mass. App. Ct. at 355. The limited facts of *Rodriguez* and *Jewett* as to lighting conditions are thus easily distinguishable from those here.

[3]See *Commonwealth* v. *Chipman*, 418 Mass. at 271 (demonstration, which was admitted in evidence, consisting of a videotaped simulation of the view a person would have standing at the site where the fatal shots were fired and looking through the defendant's telescopic rifle sight, was sufficiently similar despite depicting the scene in the fall rather than the winter; would have been of some value in aiding the jury; was informative in showing "what the sniper likely observed"; "shed light" on pertinent issues to be proved [there malice and premeditation, here identification]; and was fair in light of the other evidence corroborating the location where the shots were fired); *Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 708-709 (1974) (no abuse of discretion in allowing a jury view of the robbery scene during the day even though the crime occurred on a dark, rainy night, and the purpose of the view — to enable the jury to understand better the testimony — was fulfilled without prejudice to the defendant, even without cautionary instructions as to the difference between day and night conditions of illumination). Cf. *Commonwealth* v. *Pixley*, 42 Mass. App. Ct. 927, 928 (1997) (no error in allowing possible experimentation by deliberating jurors with binoculars that had been used by police officer to observe defendant from the sixth floor of a building spit out crack cocaine to a buyer on the street and that were in evidence).

called for the judge to unring the bell: "The things thus seen by the jurors could not well be banished from their minds." *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 29 (1923). The judge correctly noted that the defendant's "more detailed argument comes a little bit too late." The defendant did not move for a mistrial or seek any other relief at that point except to protest against the telescope being "submitted into evidence" and to suggest that the jury "should be given a very strong instruction" regarding the several differences between demonstration and event — both of which requests the judge granted. Accordingly, it is not now meet for the defendant to attack any aspect of the judge's discretionary action with respect to the demonstration.

Even had the defendant made a more detailed objection in a timely fashion, prior to juror access to the telescope, we would nonetheless uphold the judge's allowance of the demonstration as nonprejudicial (and, a fortiori, as not creating a substantial risk of a miscarriage of justice). The jury — properly instructed by the judge to draw upon their common sense and life experience — could not conceivably have been misled or confused about the essential features of telescopes and the differences between the conditions of the demonstration and those on the evening of the drug transaction. Detective Fong himself, as well as the prosecutor (in direct examination of Fong and in summation), defense counsel (in cross-examination of Fong and in closing argument), and the trial judge (in pre-demonstration and final instructions) all highlighted the several variations from the event presented by the viewing.

The judge's careful instructions — not only pointing out those differences but also stressing that the viewing of the telescope was "simply a demonstration," not evidence and "not proof of anything"; and that the jury must decide the case "solely on a fair consideration of the evidence," must "confine your deliberations to the evidence and nothing but the evidence," must "not allow [the] demonstration to substitute for your duty to evaluate all of the evidence introduced at trial," and must be "firmly convinced of the defendant's guilt," i.e., "must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant [by Detective Fong] before

you may convict him" — which we presume the jury heeded, *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990), save the day, in any event. They firmly persuade us that, even were the judge's allowance of the demonstration deemed to have been erroneous, no such prejudice could have resulted as to require reversal. No reasonable juror would have used whatever he or she drew from that demonstration contrary to those instructions or otherwise improperly so as to reduce the high degree of certainty required for conviction of the defendant under the reasonable doubt requirement. Cf. *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 (1982) (jurors are expected to follow instructions to disregard matters laid before the jury but withdrawn from their consideration); *Commonwealth* v. *Maltais*, 387 Mass. 79, 94-95 (1982) (minor legal error in instructions could not create "the slightest possibility of prejudice to the defendant" because the instructions as a whole clearly and comprehensively provided everything the jury needed to reach a correct verdict); *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 232 (1992) (judge's clear and repeated instructions about the Commonwealth's burden of proof and what was and was not evidence eliminated any prejudicial impact of prosecutorial burden shifting argument).

In sum, we conclude that no error occurred with respect to the judge's allowance of the telescope demonstration; but, even if it had, it "did not influence the jury, or [could have] had but very slight effect," *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983), quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946); and we "are confident that, if the [presumed] error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Lodge*, 431 Mass. 461, 468 (2000).[4]

*The missing witness instruction.* The defendant's challenge to

---

[4]As we have noted above, the error alleged on appeal was not properly preserved by timely objection. Since there was no prejudicial error, no substantial risk of a miscarriage of justice could have resulted, particularly given the strength of the Commonwealth's case against the defendant (including the physical evidence of the drugs taken from Berger within moments of Fong's eyewitness observations of the defendant spitting out an object and handing it to Berger in a manner Fong's training and experience convinced him reflected a drug transaction, which effectively confirmed those observa-

the trial judge's giving a "missing witness" instruction over his objection, regarding the defendant's failure to call his former girlfriend, Tasha Johnson, as a witness, is unpersuasive on the instant facts.[5] It has, of course, been sagely observed that such an instruction, and the adverse inference permitted by it (that the witness, if called, would not testify favorably to the defendant), should be allowed "only in clear cases, and with caution." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). The basic lesson of that admonition, however, is that the instruction is inappropriate when the testimony of the uncalled witness would be "merely cumulative" or otherwise "unimportant" when other witnesses have already corroborated the defense position. *Id.* at 132, 134-135. The applicable general principle remains, "whether to give a missing witness instruction is a decision that must be made on a case-by-case basis, in the discretion of the trial judge . . . [whose] decision will be overturned on appeal only if it was 'manifestly unreasonable.' " *Commonwealth* v. *Thomas*, 429 Mass. 146, 151 (1999), quoting from *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 86 (1993).

The judge in this case did not abuse her discretion, much less act manifestly unreasonably, in giving the instruction because this was a "clear case": the "missing" testimony would have been central to the defense as the principal corroborative evidence for the defendant's alibi. The defendant's own counsel told the jury in her opening statement that the defendant would explain the reason for his presence in the theater district on

---

tions, as well as the large amount of cash and cellular telephone seized from the defendant [both traditional accoutrements of the illegal drug trade], his use of a false name reflecting consciousness of guilt, and the weakness of his purported alibi). See *Commonwealth* v. *Clermy*, 421 Mass. 325, 331 (1995); *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999); *Commonwealth* v. *Pixley*, 42 Mass. App. Ct. 927, 928 (1997); *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 577, 580 (1998); *Commonwealth* v. *Jean-Jacques*, 47 Mass. App. Ct. 909, 911 (1999).

[5]The defendant does not question the legal correctness of the judge's missing witness instruction, which carefully set forth (indeed, twice repeated) the requirements classically stated in *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). See *Commonwealth* v. *Thomas*, 429 Mass. 146, 149 n.1 & 150-151 (1999). The actual objection the defendant made to giving the instruction was that it was not "necessary." We need not pass upon the adequacy of such an objection.

August 1 — not to "do any drug deals" but rather "to go out with his girlfriend, to have a nice time, to go to a club." In her closing, defense counsel reiterated the defendant's "legitimate reason" for being in the area ("I'm out there with my girlfriend . . . having a good time") and underscored the importance of that fact by declaring, "He can't be in two places at once. He can't be making a [drug] deal over [t]here while he's in front of the 7-Eleven with his girlfriend."

Thus, Tasha Johnson was concededly not just a cumulative or ancillary witness for the defendant but rather his major alibi witness, who "could have been expected to offer testimony of 'distinct importance' to the defendant's case" that "could not be duplicated" by any other witness. *Commonwealth* v. *Thomas*, 429 Mass. at 152-153.[6] See *Commonwealth* v. *Johnson*, 39 Mass. App. Ct. 410, 411 (1995). Contrast *Commonwealth* v. *Spencer*, 49 Mass. App. Ct. 383, 386-390 (2000). The defendant's own testimony (as well as counsel's representations to the jury) placed the defendant with Tasha Johnson virtually the entire evening of August 1, up to a few moments before he was arrested in the 7-Eleven.

Even if Tasha could not have provided an alibi for the entire evening, she could have given testimony covering the crucial time period prior to his entering the 7-Eleven, when she was allegedly constantly with him, so that he could not "be making a [drug] deal" in a different location. Compare *Commonwealth* v. *Thomas*, 429 Mass. at 153; *Commonwealth* v. *McQuade*, 46 Mass. App. Ct. 827, 832 (1999) (that the missing witness's testimony might not provide full corroboration is not determinative of the propriety of the instruction if that witness could have provided important, nonduplicative alibi testimony that significantly supplemented that of other witnesses). The

---

[6]In view of defense counsel's explicit representations about his alibi of being with his former girlfriend, "the defendant is in a particularly weak position to argue that the failure to call [Tasha Johnson] should not be taken to reflect on the importance of the evidence [Tasha Johnson] might have given." *Commonwealth* v. *Thomas*, 429 Mass. at 153. No more persuasive is the defendant's general plaint that the case against him was not so strong (but see note 4, *supra*) that he "could be expected to call everyone who had seen him that night." No person other than the individuals who participated in or were mentioned at the trial were ever identified as having seen the defendant on August 1.

potential significance of Tasha's testimony is accentuated by her presumed ability to explain the large amount of cash on the defendant's person as intended for child support and by her presumptively greater credibility (than that of the defendant or Berger), having no apparent motive to lie and being in no jeopardy of losing her liberty.[7] Consequently, the judge committed no error in providing a missing witness instruction to the jury.[8]

*Judgments affirmed.*

---

[7]The other foundational conditions for a missing witness instruction were also present and are not contested. Tasha was "available" to the defendant, who knew where she was staying and admitted regular contact with her (indeed, he telephoned her from jail to bail him out on August 1); she could be assumed to be friendly, being both his former girlfriend and the mother of his child; and the defendant provided no reason, plausible or otherwise, for her absence (his vague reference to her "going through some problems right now" having been an unresponsive answer to where she was at the time of trial). See *Commonwealth* v. *Thomas*, 429 Mass. at 150-151; *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134. Finally, as noted above, the Commonwealth's case against the defendant was strong enough that he "would be expected to call [such an important] witness if [he] were innocent. . . ." *Thomas*, *supra* at 150.

[8]The defendant's remaining arguments require little discussion. His claim that the prosecutor improperly "vouched for" Detective Fong's testimony and the power of his telescope (also unobjected to) is misdirected, because all of the prosecutor's remarks now challenged were fair comments on and supported by the evidence, as well as legitimate responses to the defendant's closing arguments regarding credibility. No substantial risk of a miscarriage of justice could have occurred in the circumstances of this case. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 357 (1991); *Commonwealth* v. *Berrio*, 43 Mass. App. Ct. 836, 839-840 (1997). His complaint that the judge's instructions somehow inadvertently bolstered the prosecutor's "vouching" amounts to nothing more than conclusory assertion lacking any supportive authority and is inadequate appellate argument that merits no response, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); but in any event it is belied by the judge's careful instructions on evaluating credibility, particularly that the status of witnesses as police officers was an irrelevant factor in that exercise. Finally, his attack on the judge's instruction regarding the meaning of the presumption of innocence (not objected to at trial) fails, because the Supreme Judicial Court has expressly approved of just such an instruction. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 266 (1998).