# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH vs. JEFFREY McGEE.

Middlesex. March 7, 2014. - July 1, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Evidence*, Demonstration, Present recollection refreshed, Intent, State of mind. *Intent. Witness*, Refreshment of recollection. *Practice, Criminal*, Capital case, State of mind.

At a murder trial, the judge did not abuse her discretion in allowing the defendant's son, who was six years old at the time of trial, to demonstrate, on a couch in the court room, the position in which his mother was lying as the defendant was choking her, where the position of the victim's body was probative of the central issue whether the defendant had acted with deliberate premeditation or while in the heat of passion; where the demonstration clarified and enhanced the witness's oral testimony; and where any prejudice arising from the demonstration did not outweigh its substantial probative value, especially in light of the lack of evidence to suggest that the jury were upset by the demonstration in particular and the judge's repeated curative

instructions, which were clear and detailed. [9-12]

At a murder trial, the judge did not abuse her discretion in prohibiting defense counsel from using a police report to refresh a witness's recollection as to statements that the victim allegedly had made to him, where the defendant made no showing that he was aware of those statements at the time of the killing; further, there was no merit to the claim that the defendant's inability to use the police report to refresh the witness's memory violated the defendant's right to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, where the judge permitted the defendant to inquire whether the witness had recounted to the defendant any such statements made by the victim and the witness twice stated that he had not discussed the victim's statements with the defendant. [12-15]

INDICTMENTS found and returned in the Superior Court Department on January 3, 2008.

The cases were tried before *Kathe M. Tuttman*, J.

*Eric S. Brandt*, Committee for Public Counsel Services, for the defendant.

*Hallie White Speight*, Assistant District Attorney (*Katharine B. Folger*, Assistant District Attorney, with her) for the Commonwealth.

LENK, J. The defendant appeals from his conviction of murder in the first degree on a theory of deliberate premeditation.[1] On November 20, 2007, the defendant choked and stabbed his wife to death in their apartment; the killing was witnessed by the couple's three and one-half year old son. The defendant did not dispute that he had killed his wife, asserting only that he had done so in the heat of passion and had not premeditated the act. On appeal, the defendant raises two issues. First, he contends that the trial judge erred in allowing the defendant's son to demonstrate, on a couch in the court room, the position in which his mother was lying as the defendant was choking her. Second, he objects to a ruling prohibiting him from using a police report to refresh the recollection of a witness regarding a sexual overture made by the victim.

For the reasons set forth below, we discern no error and affirm the defendant's conviction of murder in the first degree. After a review of the entire record pursuant to G. L. c. 278, § 33E, we decline to exercise our power to reduce the defendant's conviction to a lesser degree of guilt or to order a new trial.

---

[1] The defendant was also convicted of several charges arising out of a motor vehicle accident the day after the victim's death. See part 2 and note 7, *infra*. He appeals only from his conviction of murder in the first degree.

1. *Background.* a. *Facts.* We recite the facts as the jury could have found them, reserving some details for later discussion.

i. *Defendant's relationship with the victim.* The defendant and the victim, Christine McGee,[2] met while the defendant was a singer in a rock and roll band dedicated to performing music from the 1980s, which Christine enjoyed.[3] At that time, the defendant looked like what Margaret Barone, a longtime friend of the defendant and a close friend of Christine, described as an "eighties rocker"; he had long hair and wore ripped jeans. The defendant and Christine began dating and eventually moved together into an apartment in Lowell. In early 2003, the defendant and Christine separated for several weeks, during which time Christine dated another man. Upon their reconciliation, Christine discovered that she was pregnant but did not know which man was the father. The defendant told Christine that he wanted to raise the child as his own even if he was not the biological father.

While Christine was pregnant, the defendant continued to play in his band and stay out late; this schedule upset Christine. However, after the couple's son, Gavin, was born on December 1, 2003, the defendant stopped playing in his band, cut his previously long hair, and wore professional clothing instead of ripped jeans. Hoping to better support his family, the defendant began working at a store that sold heating, ventilation, and air conditioning equipment. During this time, Christine worked as a bartender several nights a week while the defendant took care of Gavin. The resulting improvement in the couple's finances and in their relationship led them to marry in May, 2005.

Beginning in late 2006, the defendant and Christine experienced tension in their relationship. The defendant's responsibilities at work changed, requiring longer hours, and Christine was unhappy that he was too tired to socialize when he arrived home in the evenings. On two occasions, the defendant was violent towards Christine. In March, 2007, he put a pillow over Christine's face while they were lying in bed with Gavin because a

---

[2]Because the victim, Christine McGee, shares a last name with the defendant, her husband, we refer to her by her first name.

[3]It is unclear from the record exactly when the defendant met Christine. The record suggests that they met sometime in 2002. Margaret Barone had known the defendant through mutual friends as a teenager. She testified that she "met up" with him again in the spring of 2002, and began to see him every other weekend. Barone also met Christine during this period, and Christine thereafter began to date the defendant.

man sent her a text message.[4] That summer, the couple moved to Tyngsboro hoping to facilitate a fresh start; in July, however, the defendant punched Christine and gave her a black eye.

The defendant and Christine separated again in early October, 2007, and the defendant moved out of their shared apartment. Christine began to date a local rock musician, Gary Hoey, and she spent one night at the house of another rock musician, Salvatore Erna. Later that month, Christine went to California for four days in an effort to appear on a reality television show called "Rock of Love with Bret Michaels."[5] The defendant was upset that Christine was seeing other men and embarrassed that she planned to appear on the television show. He told Barone that he would not "make it easy for [Christine] to go out anymore" and told a coworker he planned to contact the television show to inform the producers that Christine was married. The defendant also sent Christine a text message that read, "I don't care about my son. I just want to kill myself and I'm going to take you with me."

Early on November 10, 2007, the defendant banged on the door of Christine's Tyngsboro apartment and pushed his way inside once Christine came to the door. Christine told the defendant to leave, but he wanted to lie in bed and talk. Christine's brother, who was living with his girl friend in the apartment, telephoned police; when they arrived, they ordered the defendant to leave. Later that afternoon, the defendant returned to Christine's apartment, accompanied by his father and a police officer, to retrieve his furniture and belongings. While the defendant was retrieving his belongings, Barone arrived, and she and Christine left the apartment and went to a restaurant with Gavin. As they were sitting in the restaurant, the defendant sent Christine numerous text messages, saying first that he did not want to live without her, next that she was a "fucking whore" and a "slut," and finally that he loved her and wanted to reconcile. Despite this incident, over the course of the next week the defendant told several coworkers that he was excited to get back together with Christine and that he was optimistic about their relationship. On November 17, 2007, Christine and Gavin spent the night at the defendant's apartment, and Christine told Gavin that the apartment "may be your home."

ii. *Day of the victim's death.* On the afternoon of November 19,

---

[4]The defendant told Barone that he had "lost his mind because of [the man] who had texted [Christine] at some ungodly hour."

[5]Contestants on "Rock of Love with Bret Michaels" compete to date the lead singer of Poison, a heavy metal band.

2007, the defendant went to see his friend Mark Vigeant at Vigeant's workplace. He told Vigeant that, even though Christine had been seeing Hoey, he was willing to forgive her and wanted to get back together. That evening, Christine, Vigeant, the defendant, and a friend of Vigeant's met at a local bar. Christine played the jukebox while the defendant stood behind her and rubbed her back. The group returned to Vigeant's workplace; from there, Christine and the defendant left separately to return to the defendant's apartment. Although Vigeant, Christine, and the defendant had planned to meet at the defendant's apartment, Vigeant changed his mind. He telephoned the defendant's cellular telephone at 8:01 P.M. to let them know; the defendant answered, and Vigeant heard Gavin and Christine in the background. Between 7:30 P.M. and 8 P.M. that evening, Christine telephoned both Hoey and Erna.

Later that evening, at the defendant's apartment, Gavin, then three and one-half years old,[6] saw the defendant and Christine fighting and looking for their cellular telephones. Afterward, the defendant, Christine, and Gavin all went to sleep in the same room, with his parents in the bed and Gavin on a mattress on the floor. Sometime thereafter, when it was dark outside, Gavin woke up and heard Christine crying. He walked into the living room and saw Christine on the couch with her head "like stuck between the cushions" and the defendant "[k]illing her" by choking her with his hands. The defendant then got two knives from the kitchen, one of which was "sharp" and "round," and stuck that knife into Christine's body. Gavin testified that he and the defendant then went to bed, and that Christine "was dead when I walked out of the room."

iii. *Motor vehicle accident and the homicide investigation.* The following morning, the defendant put Gavin in his automobile and drove to Route 110 in Methuen. At approximately 10:30 A.M., the defendant's vehicle collided with a large dump truck that had been approaching from the opposite direction. When emergency responders arrived at the scene, they found Gavin in the front seat, secured by only the lap portion of his seat belt. Gavin wore a T-shirt and sweatpants, with no coat, shoes, or socks, despite the snowy weather. The defendant was conscious and alert but unresponsive to questions. Medical personnel observed horizontal cuts on the inside of the defendant's left wrist and several

---

[6]Gavin McGee was six years old at the time of trial.

puncture wounds to the left side of his chest. The defendant said that his injuries were self-inflicted, that he wanted to die, and that he had been "trying" to cause the accident.

While being treated by medical personnel, Gavin said repeatedly, "You better take me to my mommy." He also said that "daddy killed mommy" and that "there was blood, blood everywhere." When asked where Gavin's mother was, the defendant said that she was in Tyngsboro. Gavin confirmed that his mother was at his father's apartment and described its location.

Chelmsford police officers were dispatched to the defendant's apartment, where they discovered the victim's body on the floor leaning against the sofa, covered by a black comforter. There was blood on the couch and on a "dagger-style" knife lying nearby. Officers also recovered a cellular telephone and a razor blade with reddish-brown stains. The autopsy revealed six stab wounds to the victim's neck, jaw, and upper abdomen, as well as signs of strangulation. The stab wounds, inflicted after the strangulation, caused the victim's death.

2. *Trial proceedings.* On January 3, 2008, a Middlesex County grand jury indicted the defendant for the murder of his wife. Subsequently, an Essex County grand jury indicted the defendant for four different offenses arising out of the motor vehicle accident in Methuen on the morning after the victim's death.[7] A Superior Court judge granted the defendant's motion to transfer the Essex County case to Middlesex County and consolidate the charges for trial.

During his twelve-day trial, the defendant did not dispute that he had killed his wife.[8] The only question before the jury was whether the defendant had deliberately premeditated the act or whether he had acted in the heat of passion, having just discovered that the victim remained in contact with other lovers. The defendant was convicted of murder in the first degree on a theory of deliberate premeditation. He was acquitted of armed assault with intent to murder Gavin, and was convicted of all other charges. The defendant timely appealed from the murder conviction.

---

[7]The defendant was indicted for armed assault with intent to murder his son, Gavin McGee, G. L. c. 265, § 18 (*b*); assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (*b*); negligent operation of a motor vehicle, G. L. c. 90, § 24 (2) (*a*); and reckless endangerment of a child, G. L. c. 265, § 13L.

[8]The defendant offered to stipulate to having caused the victim's death.

a. *Motion to permit trial demonstration.* Prior to trial, the Commonwealth had filed a motion in limine seeking permission for Gavin, then six years old, to use a couch to demonstrate how the victim was positioned as the defendant killed her. The defendant opposed the motion, arguing that Gavin was not competent to testify and that, in any event, the demonstration would be more prejudicial than probative. On the third day of trial, the judge held a hearing on the issue and conducted a voir dire of Gavin.[9] After ruling that Gavin was competent to testify, the judge allowed the Commonwealth's motion because she concluded that the demonstration could clarify Gavin's oral testimony and was not unduly prejudicial. The judge informed counsel that she would offer a cautionary instruction to mitigate any emotional effect the demonstration might have on the jury.

Immediately prior to Gavin's testimony, the judge instructed the jury that they were to rely only on the informational value of the evidence and to disregard their emotional response. She also reminded them that they must not base their decision on sympathy or pity. After Gavin testified about the circumstances of his mother's death, the prosecutor asked him to step down from the witness stand and approach a couch, which had been brought into the court room. She requested that he show the jury how his mother had been positioned while the defendant was choking her, and asked him, specifically, where his mother's body had been located on the couch. Gavin lay down on the couch briefly[10] and then returned to the witness stand.

b. *Limitation on cross-examination of Mark Vigeant.* During the cross-examination of Vigeant, the defendant sought to elicit that the victim had suggested a sexual "threesome" to Vigeant on

---

[9]Defense counsel requested that the judge conduct a voir dire of the demonstration itself. The prosecutor stated that such a voir dire was not necessary and made a detailed offer of proof as to the contents of the proposed demonstration. She assured the judge that Gavin would not become emotional during the demonstration, and the judge did not require the voir dire.

[10]The prosecutor described Gavin's demonstration for the record as follows: "The witness got on his back, laid his back on the seat of the couch with his hands raised to either side of his head in a touchdown fashion perpendicular out at ninety-degree angles with his legs hanging over the seat of the couch onto the floor. And he was perpendicular to the couch with his head into the back cushion where the cushion and the seat meet and he was on his back." Although the record does not indicate precisely how long the demonstration took, it appears to have been quite brief; Gavin left the witness stand, positioned his body on the couch, and immediately returned to the stand.

the night of her death.[11] The judge sustained the prosecutor's objection, noting that evidence of the victim's overture was admissible only if there were evidence to suggest that the defendant knew about it. She prohibited defense counsel from inquiring as to statements the victim had made to Vigeant, but permitted counsel to question Vigeant as to whether he had relayed information about the overture to the defendant.

The judge then conducted a voir dire of Vigeant, out of the jury's presence. She asked him whether he had informed the defendant of any statements the victim made about a "threesome." Vigeant said he did not recall doing so, and the judge asked defense counsel whether she had any basis to refresh Vigeant's recollection on this point. Counsel referenced a police report[12] written during an interview Vigeant had with police. The judge commented that the police report recounted only "what Christine said [to Vigeant], not what [Vigeant] related to [the defendant]," and counsel confirmed that the report did not indicate whether Vigeant had spoken to the defendant about any sexual overture. The judge then reiterated that counsel could inquire only as to any statements Vigeant had made to the defendant on the night of the killing.

Vigeant returned to the stand and defense counsel inquired whether he recalled the topic of his conversation with the victim on the night of her death. Vigeant stated that he did not remember, and defense counsel once more sought to refresh Vigeant's recollection by means of the police report. The judge prohibited counsel from using the police report to refresh Vigeant's recollection as to the substance of his inadmissible conversation with the victim, but reiterated that counsel could inquire about statements Vigeant might have made to the defendant on the night of the victim's death concerning that conversation. Defense counsel then inquired whether Vigeant had told the defendant that the victim had made a sexual overture. Vigeant answered, "No," and the judge allowed his answer to stand over the Commonwealth's objection. Defense counsel then asked Vigeant again whether he had told the defendant anything about the victim's request. Vigeant again answered, "No." Defense counsel then asked, "You don't remember?" Vigeant replied, "I don't remember." Defense

---

[11]This evidence was in service of the defendant's ultimate claim that Vigeant had recounted the victim's overture to him during their 8:01 P.M. telephone call. See part 1.a.ii, *supra*, and part 3.b, *infra*.

[12]The report was not marked for identification.

counsel did not attempt to refresh Vigeant's recollection with the police report or otherwise as to statements he might have made to the defendant.

3. *Discussion.* a. *Trial demonstration.* The defendant contends that Gavin's demonstration violated his constitutional right to a fair trial because the demonstration had limited probative value but a substantially prejudicial effect. In allowing the demonstration, the judge determined that it was within her discretion to permit the demonstration where it could enhance and contextualize Gavin's oral testimony, and where the initial voir dire of the venire and subsequent cautionary instructions would effectively counteract its potential emotional effects.

"The permission to perform or make experiments or illustrations in the presence of the jury rest[s] in the sound judicial discretion of the . . . judge." *Commonwealth* v. *Noxon,* 319 Mass. 495, 541-542 (1946), quoting *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 260 (1933). A demonstration is appropriate if it is relevant, *Commonwealth* v. *Darby,* 37 Mass. App. Ct. 650, 653 (1994), if it is not substantially more prejudicial than probative, see *Commonwealth* v. *Rosario,* 444 Mass. 550, 557 (2005); Mass. G. Evid. § 403 (2013), and if it "sufficiently resembles the actual event so as to be fair and informative," *Commonwealth* v. *Perryman,* 55 Mass. App. Ct. 187, 193-194 (2002), quoting *Terrio* v. *McDonough,* 16 Mass. App. Ct. 163, 173 (1983). See *Commonwealth* v. *Butynski,* 339 Mass. 151, 153 (1959). We review a trial judge's decision to allow a demonstration for abuse of discretion and "will not interfere with the judge's determination unless it is plainly wrong." *Commonwealth* v. *Hartnett,* 72 Mass. App. Ct. 467, 474 (2008), citing *Commonwealth* v. *Perryman, supra* at 194. See *Commonwealth* v. *Spencer,* 465 Mass. 32, 48 (2013), quoting *Commonwealth* v. *Bys,* 370 Mass. 350, 360-361 (1976) (party claiming abuse of discretion in evidentiary ruling on motion in limine "assumes a heavy burden").

In these circumstances, "we cannot say that . . . the judge exceeded the limits of [her] discretion" in permitting Gavin to demonstrate, on a couch, the position in which his mother was lying as the defendant was choking her. See *Commonwealth* v. *Andrade,* 422 Mass. 236, 243 (1996) (affirming trial judge's allowance of demonstration).

As an initial matter, and contrary to the defendant's contention, the position of the victim's body was probative of the central

issue at trial: whether the defendant had acted with deliberate premeditation or while in the heat of passion. As the judge correctly noted, Gavin's demonstration established that, while the victim was being choked, her body was in the same position on the couch as it was depicted in the crime scene photographs, which were taken after the victim had been stabbed.[13] This similarity, in turn, tended to show that the victim did not move after she was choked, and therefore that she did nothing to provoke the defendant during the period of time when he went into the kitchen, retrieved two knives, and returned to stab her. See *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980) (manslaughter instruction appropriate only where there was evidence "that something happened which would have been likely to produce in an ordinary person" requisite heat of passion).

Absent evidence of provocation between the choking and the stabbing, the jury could conclude that the defendant premeditated the stabbing as he walked into the kitchen and retrieved the knives. See *Commonwealth* v. *Watkins*, 373 Mass. 849, 850-852 (1977) (deliberate premeditation where defendant left room where victim was located, retrieved knife from kitchen, and then returned and stabbed victim). See also *Commonwealth* v. *Gambora*, 457 Mass. 715, 733 (2010), quoting *Commonwealth* v. *Coleman*, 434 Mass. 165, 168 (2001) ("no particular period of reflection is required [for deliberate premeditation], and . . . a plan to murder may be formed in seconds").

Furthermore, the judge did not abuse her discretion in concluding that the demonstration could clarify and enhance Gavin's oral testimony. See *Commonwealth* v. *Butynski*, 339 Mass. at 153 (where defendant accused of setting up lottery based on use of pinball machine, witness could demonstrate to jury how machine was played); *Everson* v. *Casualty Co. of Am.*, 208 Mass. 214, 218, 220 (1911) (where defendant alleged injury from catching his hand beneath door, defense counsel could use model of that door where "the jury would be helped by an observation of it"). When asked about the position and location of his mother's body while the defendant was choking her, Gavin stated that his mother had been "[o]n the couch with her head between the couch," and that her head and the rest of her body had been "like stuck between the

---

[13]As stated, see part 1.a.iii, *supra*, the cause of death was the stab wounds, not the choking.

cushions." These responses suggest, and the judge found,[14] that Gavin, just six at the time of trial, lacked the vocabulary to describe certain spatial relationships. When Gavin lay down "perpendicular to the couch with his head into the back cushion where the cushion and the seat meet," and raised his hands "to either side of his head in a touchdown fashion perpendicular out at ninety-degree angles with his legs hanging over the seat," his physical actions helped the jury better understand his verbal statements.

The demonstration also assisted the jury in assessing Gavin's credibility and determining the relative weight of his testimony. Since Gavin was the only witness to the victim's death, his recollections were essential to the jury's deliberations. When asked to show the jury how his mother's body was positioned as the defendant was choking her, Gavin lay on the couch in a manner that matched the crime scene photographs of the victim. That the photographs corroborated Gavin's physical display was relevant to the accuracy of his testimony as a whole. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 585-586 (2003) (autopsy photographs that corroborated witness account of murder admissible to aid jury in assessing witness credibility).

Finally, any prejudice arising from the demonstration did not outweigh its substantial probative value.[15] See *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001) (fact that evidence bears on central issue "tips the balance in favor of admission" when weighing probative value against prejudice). Contrast *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 28 (1990), quoting *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 471 (1985) (admission of sex pamphlet where defendant charged with rape of his young daughter required reversal where probative value of pamphlet was "nugatory or nearly so" and prejudicial

---

[14] The judge stated, after voir dire, "[W]e are dealing with a six-year-old child who may be able to better express his observations through a physical reenactment than he might do verbally. Or, alternatively, it might enhance and add context and dimension to his verbal presentation."

[15] The judge was alert to the possibility of prejudice from the beginning of the defendant's trial. After individual voir dire of each member of the venire, the judge excused thirty-four potential jurors who she determined would have been unable to remain impartial or to disregard the emotional effects of the evidence. After Gavin's voir dire, the judge stated, "[E]ach juror who has been seated has satisfied the Court that he or she can separate any sympathy that may be engendered by the evidence from their duty to decide the case based only on the evidence and the law that's presented in the courtroom during the trial."

effect was considerable). The demonstration was, the record indicates, quite brief, and was not so "gruesome" or "inflammatory" as to be "rendered inadmissible," given its "evidential value on a material matter." See *Commonwealth* v. *Berry*, 420 Mass. 95, 108 (1995), quoting *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990).

Importantly, there is no evidence to suggest that the jury were upset by the demonstration in particular, as opposed to Gavin's testimony as a whole. Although defense counsel noted that two jurors were crying,[16] she did so immediately prior to the demonstration. The record does not reveal, and the defendant does not allege, that the jury grew more emotional either during or after Gavin lay down on the couch. The judge was entitled to determine, after viewing the demonstration and its effect on the jury, that the demonstration had not so distressed the jurors that it would cloud their ability to deliberate.

Moreover, the judge twice offered clear and detailed curative instructions, which we presume the jury to have followed. *Commonwealth* v. *Auclair*, 444 Mass. 348, 358 (2005). Immediately before Gavin's testimony, the judge reminded the jury that they "must separate any emotional reaction . . . from the informational value and weight of the evidence,"[17] and reiterated in her final charge that the jury must not be "swayed by prejudice, or by sympathy," but instead must "consider the evidence in a calm, dispassionate, and analytical manner." The judge was within her discretion to conclude that these cautionary instructions sufficed to cure any emotional effect the demonstration might have had on the jury. See *Commonwealth* v. *Perryman*, 55 Mass. App. Ct. 187, 196-197 (2002) (judge's thorough instruction as to demonstration that jury must decide case "solely on a fair consideration of the evidence" cured any possible prejudice).

b. *Limited cross-examination of Mark Vigeant.* The defendant contends also that the judge erred in prohibiting defense counsel from using a police report, created during the course of the homicide investigation, to refresh Vigeant's recollection as to statements the victim made to him about a sexual "threesome." As stated, the defense was that the killing was committed in the heat of passion, based on the defendant's sudden realization of the victim's continued infidelities. Although the defendant knew

---

[16]The judge, however, "hadn't noticed that" any jurors were upset.

[17]The judge also repeated this instruction in her final charge.

about the victim's past contact with Hoey and Erna, he had forgiven the victim, and he believed that, in the weeks prior to her death, she wanted to get back together with him. Defense counsel sought to argue that during their 8:01 P.M. telephone conversation on the night of the victim's death, Vigeant told the defendant that the victim had proposed a "threesome" to Vigeant.[18] Particularly where the victim also made telephone calls to both Hoey and Erna that night, counsel reasoned, the jury could infer that learning the victim had made yet another extramarital overture caused the defendant to lose control.

Accordingly, the defendant argues, his inability to refresh Vigeant's recollection with the police report led to the wrongful exclusion of evidence that was central to his theory of the case. Therefore, the defendant contends, the judge's ruling violated his right to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Washington* v. *Texas*, 388 U.S. 14, 19 (1967); *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004). We conclude that the judge acted well within her discretion in excluding the victim's statements to Vigeant and prohibiting defense counsel from refreshing with the police report Vigeant's recollection as to such inadmissible statements.

"[R]elevant evidence of the victim's state of mind of which the defendant was aware," *Commonwealth* v. *Zagranski*, 408 Mass. 278, 282-283 (1990), is admissible when offered to show its effect upon the defendant. See *Commonwealth* v. *Franklin*, 465 Mass. 895, 907 (2013); 2 McCormick on Evidence § 249, at 191-193 (K.S. Broun ed., 7th ed. 2013). See generally H.J. Alperin, Summary of Basic Law § 10.111 (4th ed. 2006) (out-of-court statements that are admissible as nonhearsay). A defendant must make a "credible showing" that he knew of the victim's state of mind, *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988), since "[o]bviously, the victim's state of mind can be relevant to the defendant's motive only if there is reason to believe that the defendant knew of that state of mind." *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied,

---

[18]Despite the defendant's theory of the case, there was no indication that the police report recounted a conversation between Vigeant and the defendant as to the victim's statements. The judge noted, and defense counsel conceded, that the report only detailed the remarks the victim made to Vigeant on the night of her death, and did not address whether Vigeant relayed those remarks to the defendant.

429 U.S. 1049 (1977). See *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997) (state of mind exception "calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it").

To the extent that the defendant contests his inability to use the police report to refresh Vigeant's recollection as to statements the victim made to Vigeant, his argument is unavailing. The judge was well within her discretion in excluding evidence of the victim's sexual overture to Vigeant where the defendant could not show that he was aware of that overture. Vigeant stated, twice, that he did not speak to the defendant about any request by the victim for a "threesome." Given this unequivocal testimony, the jury could not permissibly infer that the defendant was aware of the victim's conversation with Vigeant.[19] Contrast *Commonwealth* v. *Todd*, 394 Mass. 791, 797 (1985) (evidence of victim's statements to witness indicating intent to terminate relationship with defendant admissible where victim likely had made similar statements to defendant); *Borodine*, *supra* at 8-9 (same). Absent the "fundamental prerequisite" of the defendant's awareness of the victim's statements, *Commonwealth* v. *Lodge*, 431 Mass. 461, 470 (2000), any request the victim may have made to Vigeant was irrelevant and therefore inadmissible. The judge did not err in prohibiting defense counsel from using the police report to elicit such inadmissible testimony.

To the extent, however, that the defendant also alleges that he was wrongly prohibited from using the police report to refresh Vigeant's recollection as to his alleged conversation with the defendant, his argument has no basis in the trial transcript. Although defense counsel repeatedly sought to refresh Vigeant's recollection as to the victim's inadmissible statements to Vigeant, she did not make any such effort as to Vigeant's conversation with the defendant, and the judge did not bar her from doing so. Indeed, while the judge correctly prohibited defense counsel from eliciting testimony about the victim's statements to Vigeant, she repeatedly reminded counsel that counsel could inquire whether Vigeant had recounted any such statements to the defendant. The

---

[19]The defendant did not testify. Accordingly, the only means by which the jury could have learned of any conversation that Vigeant may have had with the defendant about the victim's offer of a "threesome" would have been through Vigeant's testimony.

defendant cannot now contest the consequences of defense counsel's strategy where there was no unfavorable ruling on the issue at trial. See *Commonwealth* v. *Simcock*, 31 Mass. App. Ct. 184, 196 (1991) ("The consequences of trial tactics may not be converted after conviction into alleged errors by the judge").

This is particularly the case where there was no foundation to refresh Vigeant's recollection as to his conversation with the defendant. Counsel may refresh a witness's recollection only if that witness's memory clearly is exhausted. See, e.g., *Commonwealth* v. *Woodbine*, 461 Mass. 720, 731 (2012). Here, Vigeant twice stated that he did not discuss the victim's overture with the defendant. See *Commonwealth* v. *Jenkins*, 458 Mass. 791, 796 n.4 (2011) ("negative responses are not the equivalent of a failure of memory"). While Vigeant subsequently went along with defense counsel's suggestion that he did not remember, that alone is an insufficient showing of exhaustion where the question had been asked, and answered, twice. Indeed, defense counsel then put further questions to Vigeant regarding his 8:01 P.M. telephone conversation with the defendant. When asked, "You're not sure if you discussed what you and Christine discussed?" Vigeant replied, "I'm pretty confident I didn't discuss anything about what I had stated." We discern no error in the aforesaid limits on testimony.

4. *Review pursuant to G. L. c. 278, § 33E.* Having reviewed the entire record consistent with our duty pursuant to G. L. c. 278, § 33E, we discern no reason to order a new trial or to reduce the degree of guilt.

*Judgment affirmed.*